## IN THE CIRCUIT COURT OF WOODRUFF COUNTY, ARKANSAS
## CIVIL DIVISION

JACQUITA ENGLES and JEFFERY
ENGLES, on behalf of themselves, and as
parents and guardians of minor
MARSHALL ENGLES, and ANA
MOLINA, individually, and on behalf of all
others similarly situated,

     Plaintiffs,

v.

ARCARE,

     Defendant.

Case No. CU- 22-43

CLASS ACTION

**FILED**

MAY 1 0 2022

JEAN BURKETT-CIRCUIT CLERK
WOODRUFF COUNTY, AR
AT____15 : 11 P____M

JURY TRIAL DEMANDED

### CLASS ACTION COMPLAINT

Plaintiffs Jacquita Engles and Jeffery Engles, on behalf of themselves and as parents and

guardians of minor Marshall Engles, and Ana Molina ("Plaintiffs"), individually, and on behalf of

all others similarly situated (collectively, "Class members"), by and through their attorneys, bring

this Class Action Complaint against ARcare and complain and allege upon personal knowledge as

to themselves and information and belief as to all other matters.

### INTRODUCTION

1.    Plaintiffs bring this class action against ARcare for its failure to secure and

safeguard their and approximately 345,353 other individuals' personally identifying information

("PII") and personal health information ("PHI"), including names, Social Security numbers,

drivers' license or state identification numbers, dates of birth, financial account information,

medical treatment information, prescription information, medical diagnosis or condition

information, and health insurance information.

2.    ARcare is a healthcare company with its principal place of business in Augusta,

Arkansas. ARcare has locations throughout Arkansas, Kentucky, and Mississippi. ARcare is an Arkansas corporation, with its principal place of business in Augusta, Woodruff County, Arkansas. ARcare may be served through its registered agent: CT Corporation System, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

3.     Between January 18, 2022 and February 24, 2022, unauthorized individuals gained access to ARcare's network systems and accessed and acquired files from the system that contained the PII/PHI of Plaintiffs and Class members (the "Data Breach").

4.     ARcare owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. ARcare breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its customers' patients' PII/PHI from unauthorized access and disclosure.

5.     As a result of ARcare's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which ARcare learned of on or about February 24, 2022, and first publicly acknowledged on or about April 25, 2022, two months after the breach was discovered.

6.     Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, breach of fiduciary duty, breach of express contract, breach of implied contract, and unjust enrichment, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

7.      Plaintiff Jacquita Engles is an Arkansas resident. She previously received medical treatment from ARcare. She received a letter from ARcare notifying her that her PII/PHI may have been exposed in the Data Breach. Plaintiff Jacquita Engles would not have obtained medical treatment from ARcare had she known that her information would not be adequately safeguarded by ARcare.

8.      Plaintiff Jeffery Engles is an Arkansas resident. He previously received medical treatment from ARcare. He received a letter from ARcare notifying him that his PII/PHI may have been exposed in the Data Breach. Plaintiff Jeffery Engles would not have obtained medical treatment from ARcare had he known that his information would not be adequately safeguarded by ARcare.

9.      Plaintiff Marshall Engles is a minor and an Arkansas Resident. He is represented by his parents, Jacquita and Jeffery Engles. He previously received medical treatment from ARcare. He received a letter from ARcare notifying him that his PII/PHI may have been exposed in the Data Breach. Plaintiff Marshall Engles would not have obtained medical treatment from ARcare had he known that his information would not be adequately safeguarded by ARcare.

10.     Plaintiff Ana Molina is an Arkansas resident. She receives medical treatment from ARcare. She received a letter from ARcare notifying her that her PII/PHI may have been exposed in the Data Breach. Plaintiff Molina would not have obtained medical treatment from ARcare had she known that her information would not be adequately safeguarded by ARcare.

11.     Defendant ARcare is a non-profit corporation incorporated in Arkansas. ARcare's corporate headquarters are located at 117 South 2nd Street, Augusta, AR 72201. ARcare may be

3

served through its registered agent: CT Corporation, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action because the amount in controversy exceeds the sum of $25,000.

13.    This Court has personal jurisdiction over ARcare because ARcare is a corporation organized under the laws of Arkansas and maintains a principal place of business in Arkansas.

14.    Venue is proper in the Circuit Court of Woodruff County because ARcare's principal place of business is located in Woodruff County.

## FACTUAL ALLEGATIONS

### Overview of ARcare

15.    ARcare is a healthcare company that provides "primary care, behavioral health, pharmacies, community outreach programs, and more."[1] ARcare states, "We want to be the primary source for all your healthcare needs from birth to retirement and beyond."[2]

16.    In the regular course of its business, ARcare collects and maintains the PII/PHI of its patients.

17.    ARcare requires new patients to fill out certain forms and are given the option to print a new patient packet and fill out the forms.[3] One form in the new patient packet is the HIPAA Privacy Practices Consent Form. The HIPAA Privacy Practices Consent Form states, "We are committed to providing security for patient privacy and confidentiality.  We collect, use, and

---

[1] *Our Story*, ARCARE, https://www.ARcare.net/our-story/ (last accessed May 2, 2022).

[2] *Health Services*, ARCARE, https://www.arcare.net/services/ (last accessed May 2, 2022).

[3] *Patient Forms*, ARCARE, https://www.arcare.net/patient-resources/patient-forms/ (last accessed May 2, 2022).

disclose personal health information only when allowed by state and federal laws and your personal authorization." *See* Exhibit A, New Patient Packet, at 4. The form goes on to state, "Without your written consent, we cannot release any information to anyone except for purposes outlined in the HIPAA privacy act." *Id.* The Form then requires the new patient to sign and initial the document. *Id.*

18.     Also included in the new patient packet is the Notice of Privacy Practices. *Id.* at 6– 9. This document states, "Our practice is dedicated to maintaining the privacy of your individually identifiable health information as protected by law, including the Health Information Portability and Accountability Act (HIPAA)." *Id.* at 6.

19.     Plaintiffs and Class members are, or were, patients of ARcare and entrusted ARcare with their PII/PHI.

### *The Data Breach*

20.     Between January 18, 2022 and February 24, 2022, an unauthorized individual, or unauthorized individuals, gained access to ARcare's network systems and accessed and acquired certain files on ARcare's computer systems. ARcare discovered the breach on February 24, 2022, over a month after it began.

21.     ARcare did not begin to notify government agencies or the public about the data breach until two months after that, on or about April 25, 2022. The notice that ARcare posted to its website states that the information that the cybercriminal had access to includes patients' "names, Social Security numbers, drivers license or state identification numbers, dates of birth, financial account information, medical treatment information, prescription information, medical diagnosis

or condition information, and health insurance information."[4]

22.    ARcare's notice also states that the Data Breach "caused a temporary disruption to services."[5]

### ARcare Knew that Criminals Target PII/PHI

23.    At all relevant times, ARcare knew, or should have known, that the PII/PHI that it collected was a target for malicious actors. Despite such knowledge, ARcare failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyber-attacks that ARcare should have anticipated and guarded against.

24.    It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the Social Security numbers ("SSNs") and medical information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[6]

25.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were

---

[4] *Notice of Data Privacy Incident*, ARCARE, https://www.arcare.net/wp-content/themes/altitude-pro/security_notice.html (last accessed May 2, 2022).
[5] *Id.*
[6] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

758 medical data breaches in 2020, with over 40 million patient records exposed.[7] This is an increase from the 572 medical data breaches that Protenus compiled in 2019.[8]

26.    PII/PHI is a valuable property right.[9] The value of PII/PHI as a commodity is measurable.[10] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[11] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[12] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

27.    As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

---

[7] Protenus, *2021 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/resources/2021-breach-barometer (last accessed May 2, 2022).

[8] Protenus, *2020 Breach Barometer*, PROTENUS.COM, https://www.protenus.com/resources/2020-breach-barometer (last accessed May 2, 2022).

[9] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"),
https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[10] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[11] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[12] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

28.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[13] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[14]

29.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[15] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[16]

30.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[17] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[18]

---

[13] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[14] *Id.*

[15] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[16] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last accessed May 2, 2022).

[17] *What Happens to Stolen Healthcare Data, supra* at n.13.

[18] *Id.*

31.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[19]

32.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

33.     Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[20]

34.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[21] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is

---

[19] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[20] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed May 2, 2022).

[21] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[22]

35.     With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[23]

36.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[24]

37.     Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to

---

[22] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/ (last accessed May 2, 2022).

[23] *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed May 7, 2021).

[24] Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed May 7, 2022).

demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

38.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[25]

39.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[26] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[27] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [28] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to

---

[25] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[26] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf
[27] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk...*, *supra* at n.16.
[28] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed May 2, 2022).

use."[29]

40.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[30]

41.     There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[31]

---

[29] *Id.*
[30] *See* Pam Dixon and John Emerson, *The Geography of Medical Identity Theft, supra* at n.26.
[31] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

42.     It is within this context that Plaintiffs and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiffs and the Other Class Members*

43.     Plaintiffs and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

## CLASS ALLEGATIONS

44.     This action is brought and may be properly maintained as a class action pursuant to Arkansas Rule of Civil Procedure 23.

45.     Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All persons living in Arkansas whose PHI/PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all Arkansas residents who were sent a notice of the Data Breach.

46.     Excluded from the Class is ARcare and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

47.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

48.    The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. ARcare reported to the United States Department of Health and Human Services Office of Civil Rights that approximately 345,353 persons' information was exposed in the Data Breach.

49.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a.    Whether ARcare had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' PII/PHI from unauthorized access and disclosure;

    b.    Whether ARcare failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' PII/PHI;

    c.    Whether an implied contract existed between Class members and ARcare, providing that ARcare would implement and maintain reasonable security measures to protect and secure Class Members' PII/PHI from unauthorized access and disclosure;

    d.    Whether ARcare breached its duties to protect Plaintiffs' and Class members' PII/PHI; and

    e.    Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

50.     ARcare engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

51.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by ARcare, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

52.     Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

53.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against ARcare, so it would be impracticable for Class members to individually seek redress from ARcare's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

#### NEGLIGENCE

54.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

55.     ARcare owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

56.     ARcare's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules"). Plaintiffs and Class members are the persons that the HIPAA Privacy Rule and HIPAA Security Rule were intended to protect and the harm that Plaintiffs and Class members suffered is the type of harm the HIPAA Privacy Rule and HIPAA Security Rule intended to guard against.

57.     ARcare's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as ARcare, of failing to employ reasonable measures to protect and secure PII/PHI. Plaintiffs and Class members are the persons that the Section 5 of the FTCA was intended to protect and the harm that Plaintiffs

and Class members suffered is the type of harm Section 5 of the FTCA intended to guard against.

58.    ARcare knew the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems. ARcare knew of the many data breaches that targeted companies that stored PII/PHI in recent years.

59.    Given the nature of ARcare's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, ARcare should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

60.    ARcare breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class members' PII/PHI.

61.    It was reasonably foreseeable to ARcare that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

62.    But for ARcare's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

63.    As a result of ARcare's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members

have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT II

### BREACH OF FIDUCIARY DUTY

64.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

65.     Plaintiffs and Class members gave ARcare their PII/PHI in confidence, believing that ARcare would protect that information. Plaintiffs and Class members would not have provided ARcare with this information had they known it would not be adequately protected. ARcare's acceptance and storage of Plaintiffs' and Class members' PII/PHI created a fiduciary relationship between ARcare and Plaintiffs and Class members. In light of this relationship, ARcare must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiffs' and Class Members' PII/PHI.

66.     ARcare has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiffs' and Class Members'

PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiffs' and Class members' PII/PHI that it collected.

67.     As a direct and proximate result of ARcare's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in ARcare's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## COUNT III

## BREACH OF EXPRESS CONTRACT

68.     Plaintiffs realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69.     Plaintiffs and Class members and ARcare entered into written agreements, including the HIPAA Privacy Practices Consent Form, regarding the medical care and other services that ARcare was to provide to Plaintiffs and Class members. Plaintiffs and Class members paid ARcare monies and provided ARcare with their PII/PHI as consideration for these agreements, directly or through an insurance carrier.

70.     Plaintiffs and Class members complied with the express contract when they paid ARcare, directly or through an insurance carrier and provided their PII/PHI to ARcare.

71.     ARcare breached its obligations under the contracts between itself and Plaintiffs and Class members by failing to implement and maintain reasonable security measures to protect and secure their PII/PHI.

72.     ARcare's breach of the express contracts between itself, on the one hand, and Plaintiffs and Class members, on the other hand directly caused the Data Breach.

73.     Plaintiffs and all other Class members were damaged by ARcare's breach of express contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV

## BREACH OF IMPLIED CONTRACT

74.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

75.     In connection with receiving health care services, Plaintiffs and all other Class members entered into implied contracts with ARcare.

76.     Pursuant to these implied contracts, Plaintiffs and Class members paid money to ARcare and provided ARcare with their PII/PHI. In exchange, ARcare agreed to, among other things, and Plaintiffs understood that ARcare would: (1) provide health care to Plaintiffs

and Class member; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PHI; and (3) protect Plaintiffs' and Class members PII/PHI in compliance with federal and state laws and regulations and industry standards.

77.    The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and ARcare, on the other hand. Indeed, as set forth *supra*, ARcare recognized the importance of data security and the privacy of its patients' PII/PHI in its Notice of Privacy Practices and HIPAA Privacy Practices Consent Form. Had Plaintiffs and Class members known that ARcare would not adequately protect its patients' and former patients' PII/PHI, they would not have received health care services from ARcare.

78.    Plaintiffs and Class members performed their obligations under the implied contract when they provided ARcare with their PII/PHI and paid for health care services from ARcare.

79.    ARcare breached its obligations under its implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

80.    ARcare's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

81.    Plaintiffs and all other Class members were damaged by ARcare's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and

medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT V

### UNJUST ENRICHMENT

82.     Plaintiffs reallege and incorporate by reference paragraphs 1–53 as if fully set forth herein.

83.     This claim is pleaded in the alternative to the breach of express contract and breach of implied contract claims.

84.     Plaintiffs and Class members conferred a monetary benefit upon ARcare in the form of monies paid for health care services.

85.     ARcare accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. ARcare also benefitted from the receipt of Plaintiffs' and Class members' PII/PHI, as this was used to facilitate the billing services.

86.     As a result of ARcare's conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

87.    ARcare should not be permitted to retain the money belonging to Plaintiffs and Class members because ARcare failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

88.    ARcare should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against ARcare as follows:

A.    Certifying the Class as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent ARcare from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: May 5, 2022                                    Respectfully submitted,

                                                      */s/ Shawn Daniels*
                                                      Shawn B. Daniels, Bar No. 99126
                                                      Daniels Law Firm, PLLC
                                                      129 W. Sunbridge Drive
                                                      Fayetteville AR 72703
                                                      Phone: (479) 521-7000
                                                      Fax: (479) 437-2007
                                                      shawn@danielsfirm.com


                                                      Ben Barnow*
                                                      Anthony L. Parkhill*
                                                      Riley W. Prince*
                                                      **BARNOW AND ASSOCIATES, P.C.**
                                                      205 West Randolph Street, Ste. 1630
                                                      Chicago, IL 60606
                                                      Tel: 312-621-2000
                                                      Fax: 312-641-5504
                                                      b.barnow@barnowlaw.com
                                                      aparkhill@barnowlaw.com
                                                      rprince@barnowlaw.com


                                                      Gary E. Mason*
                                                      Danielle L. Perry*
                                                      Lisa A. White*
                                                      **MASON LLP**
                                                      5301 Wisconsin Avenue, NW
                                                      Suite 305
                                                      Washington, DC 20016
                                                      Tel: (202) 429-2290
                                                      gmason@masonllp.com

24

dperry@masonllp.com
lwhite@masonllp.com

***pro hac vice*** to be submitted

# Exhibit A



# HOUSEHOLD ASSESSMENT
(ONLY for patients requesting discounted services)

ARcare/ KentuckyCare /MississippiCare offer a discounted fee program (nominal/sliding fee discount) to eligible patients who apply for assistance. The discounts are based on the Federal Poverty Guidelines. Discounts are given up to 200% of the Federal Poverty Level. Income verification must be provided **before discounts will be applied**. Discounts will not be given to households above 200% of the Federal Poverty Level.

Is Patient head of Household? [  ] yes   [  ] no
If no, who is the head of Household? _____

**List all dependents (anyone who resides with you and for whom you have legal, custodial, or financial responsibility.** Please list the **total monthly** gross income for each household member.

| Name | Relation to Patient | Birth Date | Income |
|------|---------------------|------------|--------|
|      | *self*              |            |        |
|      |                     |            |        |
|      |                     |            |        |
|      |                     |            |        |
|      |                     |            |        |
|      |                     |            |        |
|      |                     |            |        |
|      |                     |            |        |

By signing this application, I represent that the information and answers given in this application are true, complete and correctly recorded. If fraudulent misstatements were made, the organization reserves the right to request full payment for services provided to the patient. I understand that any charges for my household that are not covered by the discounted service program are my responsibility for my household and I agree to pay for these charges

_____        _____
Signature                                                                Date

## *For office use only:* Show your calculations

Total Annual Income: _____ Total of Household Members Qualified: _____

Eligible for Sliding Fee Discount Program Level: (Circle one)
**MEDICAL**: [A –$30] [B – 20%] [C – 40%] [D – 60%] [E – 80%] [F– 95%] [G – 100%]

**DENTAL**: [A –$60] [B –40%] [C –30%] [D –20%] [E – 10%] [F– 5%] [ G- 100%]

EFFECTIVE DATE: _____ EXPIRATION DATE: _____

Reviewed by: _____        Date: _____

 **CONSENT TO TREATMENT**

I give permission for ARcare/KentuckyCare/MississippiCare to give _____
medical treatment.                                                                        Patient's Name

Date of Birth: _____        SSN: _____

*Initial ONE:*

[     ] I am the patient.

[     ] Patient is a minor who is _____ years of age.

[     ] Patient is an adult who cannot act on his or her own.

*If Patient is a minor:*

I give permission for my child to receive an examination and treatment in the absence of adult supervision.

[   ] Yes        [   ] No

I give permission for the following individuals (other than parent/legal guardian) to bring my child to the clinic on my behalf **(Select at least ONE):**

[   ] None       [   ] School staff      [   ] Clinic staff      [   ] Daycare staff       [   ] Other *(please list)*

_____

_____

_____

| Emergency Contact | Relationship | Phone Number |
|---|---|---|
|  |  |  |

1. I voluntarily consent to medical care recommended by the medical provider including, x-rays, heart tracings, medications, and/or routine laboratory testing (including human immunodeficiency virus infection, hepatitis, or any other blood-borne infectious disease if ordered by a clinician for diagnostic purposes).
2. I authorize the clinic to release medical information to insurance carriers for the purposes of filing insurance claims related to my/his/her medical care.
3. I agree that insurance (if applicable) will billed for services and I (patient, parent or guardian of the patient) am responsible for any charges not paid or denied by the insurance company.
4. I understand that even if you have a copy of my Advance Directive or Living Will that clinic staff will attempt to stabilize me and transfer me to an acute care hospital for further evaluation and treatment.
5. This form has been fully explained to me and I understand its contents.

COMMENTS: _____

_____

_____        _____        _____
Signature of patient or adult consenting for patient         Relationship to Patient         Date

_____        _____
Signature of staff who explained the contents of this consent form         Date



# Consent to Obtain Medication History

Our medical practice has adopted an electronic medical record system in order to improve the quality of our services. This system also allows us to collect and review your "medication history." A medication history is a list of prescription medicines that we or other doctors have recently prescribed for you. This list is collected from a variety of sources, including your pharmacy and your health insurer.

An accurate medication history is very important to helping us treat you properly and in avoiding potentially dangerous drug interactions.

By signing this consent form you give us permission to collect, and give your pharmacy and your health plan permission to disclose information about your prescriptions that have been filled at any pharmacy or covered by any health insurance plan. This includes prescription medicines to treat AIDS/HIV and medicines used to treat mental health conditions, such as depression. This information will become part of your medical record.

The medication history is a useful guide, but it may not be completely accurate. Some pharmacies do not make drug history available to us, and the drug history from your health plan might not include drugs that you purchased without using your health insurance. Your medication history might not include over the counter medicines, supplements or herbal remedies. It is still very important for us to take the time to discuss everything you are taking, and for you to point out to us any errors in your medication history.

**I give permission for you to obtain my medication history from my pharmacy, my health plans and my other healthcare providers.**

Patient's Name:
Signature:
Date:

 **HIPAA PRIVACY PRACTICES CONSENT FORM**

We are committed to providing security for patient privacy and confidentiality. We collect, use, and disclose personal health information only when allowed by state and federal laws and your personal authorization. This may include the collection of other sources of information available, such as medication and prescription history and verification of insurance eligibility.

We also understand you may have family members or significant people in your life who you may want to have access to certain information contained in your medical record. Without your written consent, we cannot release any information to anyone except for purposes outlined in the HIPAA privacy act. **Please note that we use an automated phone system to remind you of appointments as well as offer patients the opportunity to complete a survey about their visit.**

I give permission for those (employees, students, volunteers, contractors, etc.) acting on behalf of the organization to share my protected health information (PHI) with the following specific person(s): *(If no other person is authorized to receive your PHI, write N/A in the spaces below.)*

| Name of Individual to which information can be released | Information to be released (Enter corresponding # from list |
|---|---|
| | |
| | |
| | |
| | |
| *If 12-17years of age, patient must sign here to acknowledge approval of information to be released.* | |

**Information to be released:**
[1] Copy of complete health record
[2] History and physical
[3] Test results
[4] Mental health records
    [5] Reproductive health records
[6] Other _____

***\*\*I understand that I can revoke this release of medical information at any time by completing a new form.***

I give my permission to: *(INITIAL all that apply)* **MUST INITIAL AT LEAST ONE**
[    ]  Leave a message on my answering machine or other electronic device(s) about my appointments, lab results, follow-up care, or other medical information
[    ]  Contact me at my home address and phone number.
[    ]  Leave a message with the person indicated as a "message" number if I cannot be reached otherwise.
[    ]  Send me an email message at: _____
[    ]  Contact me regarding voluntary participation in a clinical research. I understand that by checking this box I am NOT obligated to participate in any specific project. Please contact me about projects by:
        [ ] mail        [ ] phone        [ ] email address:
[    ]  I have received a copy of the Notice of Privacy Practices.

_____        _____

Print Name of PATIENT                                      Date of Birth

_____          _____
Signature of Patient OR Guardian                          Date

## PATIENT FINANCIAL OBLIGATION FORM

I UNDERSTAND THE FOLLOWING:

- I am responsible for any charges that are incurred during my office visit.
- If I have insurance, I am responsible for co-pays, deductibles and co-insurance.
- If I fail to meet my financial obligations, my account will be sent to a collection agency after 90 days.
- I will have an opportunity to pay on this account before it will be sent to collections.
- I will receive 3 statements before my account will be turned over to collections.
- If I overpay and have a credit, the credit will be applied to other open claim balances. If no open claim balance exists and I have been turned over to a collection agency in the past, an in-house credit will be provided and issuance of a refund check will be deferred for one year.
- A payment plan is available at my request for unpaid balances before going to collections.
- Should I be unable to make a payment on my account at this time, I understand that the clinic will see me regardless of my ability to pay.

**The organization's discounted fee program has been explained to me.**
**I do [  ]  OR  do not [  ] wish to participate in this program.**

### DISCLAIMER

I understand, acknowledge, and agree that to collect any money that I owe to the facility:

- I may be contacted by telephone or text message to any phone number that I give or is included on my account (including cell phone numbers that can result in charges on my phone account).

- ARcare/KentuckyCare/MississippiCare, or any other collection or servicing agency operating on behalf of the organization may contact me with auto dialing devices, pre-recorded messages, or voice mail messages.

- ARcare/KentuckyCare/MississippiCare, or any other collection or servicing agency operating on behalf of the organization may contact me using any e-mail address I provide to the organization or that is included on my account.

I understand the collection policy as explained above.

_____          _____
Patient OR Guarantor Signature                           Date

_____          _____
Print Patient Name                                        Date of Birth

Patient OR Guarantor Mailing Address: _____

_____

_____                    _____
Staff Witness Signature                                                    Date



## NOTICE OF PRIVACY PRACTICES

As Required by the Privacy Regulations Created as a Result of the
Health Insurance Portability and Accountability Act of 1996 (HIPAA)

THIS NOTICE DESCRIBES HOW HEALTH INFORMATION ABOUT YOU (AS A PATIENT OF THIS PRACTICE)
MAY BE USED AND DISCLOSED, AND HOW YOU CAN GET ACCESS TO YOUR INDIVIDUALLY IDENTIFIABLE
HEALTH INFORMATION. PLEASE REVIEW THIS NOTICE CAREFULLY

### A. OUR COMMITMENT TO YOUR PRIVACY

Our practice is dedicated to maintaining the privacy of your individually identifiable health information as protected by law, including the Health Information Portability and Accountability Act (HIPAA). In conducting our business, we will create records regarding you and the treatment and services we provide to you. We are required by law to maintain the confidentiality of information that identifies you. We also are required by law to provide you with this notice of our legal duties and the privacy practices that we maintain in our practice concerning your Personally Identifiable Information (PII). By federal and state law, we must follow the terms of the notice of privacy practices that we have in effect at the time.

We realize that these laws are complicated, but we must provide you with the following important information:

- How we may use and disclose your PII
- Your privacy rights in your PII
- Our obligations concerning the use and disclosure of your PII

This notice describes ARcare's/KentuckyCare's/MississippiCare's privacy practices and that of:
➢    All of our doctors, nurses, and other health care professionals authorized to enter information about you into medical chart.
➢    All of our departments including medical records, billing and insurance departments.
➢    All of our employees, staff, volunteers and other personnel who work for us or on our behalf.
➢    In addition these sites and locations may share medical information with each other for treatment, payment or operation purposes described in this notice.

**The terms of this notice apply to all records containing your PII that are created or retained by our practice. We reserve the right to revise or amend this Notice of Privacy Practices. Any revision or amendment to this notice will be effective for all of your records that our practice has created or maintained in the past, and doe any of your records that we may create or maintain in the future. Our practice will post a copy of our current Notice in our offices in a visible location at all times, and you may request a copy of our most current Notice at any time.**

### B. IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE:
**Privacy Officer**
**P.O. Box 497, Augusta, AR 72006**
**Phone: (870)347-3474**

### C. WE MAY USE AND DISCLOSE YOUR PROTECTED HEALTH INFORMATION (PII) IN THE FOLLOWING WAYS:

1. **Treatment.** Our practice may use your PII to treat you. For example, we may ask you to have laboratory tests (such as blood or urine tests), and we may use the results to help us reach a diagnosis. We might use your PII in order to write a

prescription for you, or we might disclose your PII to a pharmacy when we order a prescription for you. Many of the people who work for our practice- including, but not limited to, our doctors and nurses- may use or disclose your PII in order to treat you or to assist others in your treatment. Additionally, we may disclose your PII to others who may assist in your care, such as your spouse, children or parents. Finally, we may also disclose your PII to other health care provides for purpose related to your treatment.

2. **Payment.** Our practice may use and disclose your PII in order to bill and collect payments for the services and items you may receive from us. For example, we may contact your health insurer to certify that you are eligible for benefits (and for what range of benefits) and we may provide your insurer with details regarding your treatment to determine if your insurer will cover, or pay for, your treatment. We also may use and disclose your PII to obtain payment from third parties that may be responsible for such costs, such as family members. Also, we may use your PII to bill you directly for services and items. We may disclose your PII to other health care providers and entities to assist in their billing and collection efforts. You have the right to restrict disclosures of protected health information to health plans if you have paid for services out of pocket in full.

3. **Health Care Operations.** Our practice may use and disclose your PII to operate our business. As examples of the ways in which we may use and disclose your information for our operations, out practice may use your PII to evaluate the quality of care you received from us, or to conduct cost- management and business planning activities for our practice. We may disclose your PII to other health care providers and entities to assist in their health care operations. We may make your health information available electronically through an electronic health information exchange to other health care providers and healthcare plans that request your information for their treatment and payment purposes. Participation in electronic health information exchange also lets us see their information about you for our treatment and payment purposes.

4. **Appointment Reminders.** Our practice may use and disclose your PII to contact you and remind you of an appointment.

5. **Treatment Options.** Our practice may use and disclose your PII to inform you of potential treatment options or alternatives.

6. **Health-Related Benefits and Services.** Our practice may use and disclose your PII to inform you of health-related benefits or services that may be of interest to you.

7. **Fundraising.** We may contact you to raise funds for our organization.

8. **Release of Information to Family/ Friends.** Our practice may release your PII to a friend or family member that is involved in your care or assists in taking care of your For example, a parents or guarding may ask a babysitter to take there child to the pediatrician's office for treatment of a cold. In this example, the babysitter may have access to this child's medical information.

9. **Disclose Required by Law.** Our practice will use and disclose your PII when we are required to do so by federal, state, or local law.

## D. <u>USE AND DISCLOSURE OF YOUR PII IN CERTAIN SPECIAL CIRCUMSTANCES</u>

The following categories describe unique scenarios in which we may use or disclose your personally identifiable health information.

1. **Public Health Risks.** Our practice may disclose your PII to public health authorities that are authorized by law to collect information for the purpose of:
   - Maintaining vital records, such as births and deaths
   - Reporting child abuse or neglect
   - Preventing or controlling disease, injury or disability
   - Notifying a person regarding potential exposure to a communicable disease
   - Notifying a person about a potential risk for spreading or contracting a disease or condition
   - Reporting reactions to drugs or problems with products or devices
   - Notifying individuals if a product or device they may be using has been recalled
   - Notifying appropriate government agencies and authorities regarding the potential abuse or neglect of an adult patient (including domestic violence); however, we will only disclose this information if the patient agrees or we are required or authorized by law to disclose this information.
   - Notifying your employer under limited circumstances related primarily to workplace injury or illness or medical surveillance.

2. **Health Oversight Activities.** Our practice may disclose your PII to a health oversight agency for activities authorized by law. Oversight activities can include, for example, investigations, inspections, audits, surveys, licensure and disciplinary actions; civil, administrative, and criminal procedures or actions; or other activities necessary for the government to monitor government programs, compliance with civil rights laws and the health care system in general.

3. **Lawsuits and Similar Proceedings.** Our practice may use and disclose your PII in response to a court or administrative order, if you are involved in a lawsuit or similar proceeding. We also may disclose your PII in response to a discover request, subpoena, or other lawful process by another party involved in the dispute, but only if we have made an effort to inform you of the request or to obtain an order protecting the information the party had requested.

4. **Law Enforcement.** We may release PII if asked to do so by law enforcement official:
   - Regarding a crime victim in certain situation, id we are unable to obtain the person's agreement
   - Concerning a death we believe had resulted from criminal conduct
   - Regarding criminal conduct at our offices
   - In response to a warrant, summons, court order, subpoena or similar legal process
   - To identify/locate a suspect, material witness, fugitive or missing person
   - In an emergency, to report a crime (including the location or victim (s) of the crime, or the description, identity or location of the perpetrator)

5. **Deceased Patients.** Our practice may release PII to a medical examiner or coroner to identify a deceased individual or to identify the cause of death. If necessary, we also may release information in order for funeral directors to perform their job.

6. **Organ and Tissue Donation.** Our practice may release your PII to organizations or coroner to identify a deceased individual or to identify the cause of death. If necessary, we also may release information in order or tissue donation and transplantation if you are an organ donor.

7. **Research.** Our practice may use and disclose your PII for research purpose in certain limited circumstances. We will obtain your written authorization to use your PII for research purpose except when Internal or Review Board of Privacy Board has determined that the wavier of your authorization satisfies the following: (i) the use or disclosure involves no more than a minimal risk to your privacy based on the following: (A) an adequate plan to protect the identifiers from improper use and discloser; (B) and adequate plan to destroy the identifiers at the earliest opportunity consistent with the research (unless there is a health or research justification for retaining the identifiers or such retention is otherwise required by law); and (C) adequate written assurance that the PII will not be re-used or disclosed to any other person or entity (except as required by law) for authorized oversight of the reach study, or for other research for which the use of discloser would otherwise be permitted; (ii) the research could not practicably be conducted without the waiver; and (iii) the research could not practicably be conducted without access to and use of the PII.

8. **Serious Threats to Health or Safety.** Our practice may use and disclose your PII when necessary to reduce or prevent a serious threat to your health and safety or the health and safety of another individual or the public. Under these circumstances, we will only make disclosures to a person or organization able to help prevent the threat.

9. **Military.** Our practice may disclose your PII if you are a member of U.S. or foreign military forces (including veterans) and if required by the appropriate authorities.

10. **National Security.** Our practice may disclose your PII to federal officials for intelligence and national security activities authorized by law. We also may disclose your PII to federal officials in order to protect the president, other officials or foreign heads of state, or to conduct investigations..

11. **Workers' Compensation.** Our practice may release your PII for workers' compensation and similar programs.

12. **Coroner, Medical Examiner, Funeral Director.** We may release Health Information to a coroner or medical examiner. This may be necessary, for example, to identify a deceased person or determine the cause of death. We also may release Health Information to funeral directors as necessary for their duties.

13. **Business Associates.** We may disclose Health Information to our business associates that perform functions on our behalf or provide us with services if the information is necessary for such functions or services. For example, we may use another company to perform billing services on our behalf. All of our business associates are obligated to protect the privacy of your information and are not allowed to use or disclose any information other than as specified in our contract.

14. **Inmates or Individuals in Custody..** If you are an inmate of a correctional institution or under the custody of a law enforcement official, we may release Health Information to the correctional institution or law enforcement official. This release would be if necessary: (a) for the institution to provide you with health care; (b) to protect your health and safety or the health and safety of others; or (c) the safety and security of the correctional institution.

## E. YOUR RIGHTS REGARDING YOUR PII
You have the following rights regarding the PII that we maintain about you:

1. **Confidential Communications.** You have the right to request that our practice communicate with you about your health and related issues in a particular manner or at a certain location. For instance, you may ask that we contact you at home, rather than work, in order to request a type of confidential communication, you must make a written request to the Privacy

Officer specifying the requested method of contact or the location where you wish to be contacted, our practice will accommodate reasonable request. You do no need to give a reason for your request.

2. **Requesting Restrictions.** You have the right to request a restriction in our use or disclosure of your PII for treatment, payment or health care operations. Additionally, you have the right to request that we restrict our disclosure of your PII to other certain individuals involved in your care or the payment for your care, such as family members and friends. **We are not required to agree to your request;** however, if we do agree, we are bound by our agreement except when otherwise required by law, in emergencies, or when the information is necessary to treat you. In order to request a restriction in our use or disclosure of your PII, you must make your request in writing to the Privacy Officer. Your request must describe in a clear and concise fashion:

   a) the information you wish restricted;
   b) whether you are requesting to limit our practice's use, disclosure or both; and
   c) to whom you want the limits to apply

3. **Inspection and copies.** You have the right to inspect and obtain a copy (paper or electronic) of the PII that may be used to make decisions about you, including patient medical records and billing records, but not including psychotherapy notes. You must submit your request in writing to the privacy Officer in order to inspect and/or obtain a copy of your PII. Our practice may charge a fee for the costs of copying, mailing, labor and supplies associated with your request. Our practice may deny your request to inspect and/or copy in certain limited circumstances; however, you may request a review of our denial. Another licensed health care professional chosen by us will conduct reviews.

4. **Amendment.** You may ask us to amend your health information if you believe it is incorrect or incomplete, and you may request an amendment for as long as the information is kept by or four our practice. To request an amendment, your request must be made in writing and submitted to the Privacy Officer. You must provide us with a reason that supports your request for amendment. Our practice will deny your request if you fail to submit your request (and the reason supporting your request) in writing. Also, we may deny your request if you ask us to amend information that is in our opinion (a) accurate and complete; (b) not part of the PII kept by or for the practice; (c) not part of the PII which you would be permitted to inspect and copy; or (d) not created by our practice, unless the individual or entity that created the information is not available to amend the information.

5. **Accounting of Disclosures.** All of our patients have the right to request an "accounting of disclosures". An "accounting of disclosers" is a list of certain not-routine disclosers our practice has made of your PII for non-treatment, not payment or non-operations purpose. Use of your PII as part of the routine patient care in our practice is not required to be documented. For example, the doctor was sharing information with nurse; or the billing department using your information to file your insurance claim. Also, we are not required to document disclosures made pursuant to an authorization signed by you. To obtain an accounting of disclosures, you must submit your request in writing to the Privacy Officer. All requests for an accounting of disclosure must state a time period, which may not be longer than six (6) years from the date of disclosure and may not include dates before April 14, 2003. The first list you request within a 12-month periods is free of charge; but our practice may charge you for additional lists within the same 12-month periods. Our practice will notify you of the costs involved with addition requests, and you may withdraw your request before you incur any costs.

6. **Rights to a Paper Copy of This Notice.** You are entitled to receive a paper copy of our notice of privacy practices. You may ask us to give you a copy of this notice at any time. To obtain a paper copy of this notice, contact the Privacy Officer.

7. **Right to File a Complaint.** If you believe your privacy rights have been violated, you may file a complaint with our practice or with the Secretary of the Department of Health and Human Services. To file a complaint with our practice, contact the Privacy Officer.

**Privacy Officer**
**P.O. Box 497, Augusta, AR 72006**
**Phone: (870)347-3474**

We urge you to file your complaint with us first and give us the opportunity to address your concerns. All complaints must be submitted in writing. **You will not be penalized for filing a complaint.**

8. **Right to Provide an Authorization for Other Uses and Disclosures.** Our practice will obtain your written authorization for uses/disclosures that are not identified by this notice or permitted by applicable law. Any authorization you provide to us regarding the use and disclosure of your PII may be revoked at any time in writing. After you revoke you authorization, we will no longer use or disclose your PII for the reasons described in the authorization. Please note, we are required to retain records of you care.

9. **Right to Notice in the Event of a Breach.** Our practice will notify you in the event there is a breach of your PII.

*For complete details about how we may use your PII, please visit:*
*https://www.arcare.net/PrivacyPolicy*
*https://www.kentuckycare.net/PrivacyPolicy*
*https://www.mississippicare.net/PrivacyPolicy*

 # ARcare/KentuckyCare/MississippiCare

This organization is a private non-profit corporation developed in 1986 to meet the primary care needs of residents in its service area. This includes providing education and prevention programs to supplement services available through other area agencies as well as providing quality service to all residents. This organization has been accredited by the Joint Commission since 1997 and is recognized as Primary Care Medical Homes committed to improving primary care and improving the quality, safety, efficiency, and effectiveness of health care through these approaches:

- **Patient-centered:** A partnership among practitioners, patients, and their families ensures that decisions respect patients' wants, needs, and preferences, and that patients have the education and support they need to make decisions and participate in their own care.

- **Comprehensive:** A team of care providers is wholly accountable for a patient's physical and mental health care needs, including prevention and wellness, acute care, and chronic care.

- **Coordinated:** Care is organized across the health care system, including specialty care, hospitals, home health care, community services and supports. This supplies comprehensive health information to those that are providing your care and helps to determine the best place for you to access care that you need.

- **Accessible:** Patients are able to access services with expanded after-hours care, 24/7 electronic or telephone access, and through your personal patient portal. You also have access to patient education materials through your patient portal, our websites, and through our patient education programs.

- **Committed to quality and safety:** Your health care team is focused on quality care and ensure that patients and families can make informed decisions about their health. We also follow evidence-based care guidelines so that we can help you maximize your health.

Services are available in multiple clinic sites located throughout Arkansas, Kentucky, and Mississippi. Primary Health Care services provided include primary care, emergency medical care, and wellness services. Specialty services offered in limited areas include: diagnostic lab and x-ray, pharmacy, transportation, behavioral health, substance abuse treatment, and HIV/AIDS services. We also offer Diabetic Education Centers, Wellness Centers, Aging Illness Management, and Cancer Care as special programs in some areas.

All clinics are open Monday-Friday 8 a.m. to 5 p.m. with some evening and weekend hours. If you need medical services after regular business hours, please call:

ARcare: **501-268-6121**        KentuckyCare: **877-791-9154**        MississippiCare: **501-530-6016**

For over thirty years, individuals and families have trusted this organization for quality care, regardless of ability to pay. Our patients include those with insurance, those without insurance, and those lacking enough insurance. Private insurance and Medicare are accepted. This center participates in the Medicaid Managed Care Program and provides eligibility assistance for other Medicaid programs. Although we are not a free clinic, we offer discounted (nominal) fees to eligible patients so that everyone can receive the care they need.

For questions or more information about services, locations, or patient health education services please contact:
**877-578-9400** or visit our websites at: https://www.arcare.net    https://www.kentuckycare.net
https://www.mississippicare.net

## Clinic Locations & Phone Numbers

### ARKANSAS

Augusta Longevity & Cancer Center:  870-347-3451
Augusta Pediatric Clinic: 870-347-3402
Batesville-Vine Medical: 870-793-4600
Benton Medical: 501-860-7150
Brinkley Medical: 870-734-1150
Cabot South Medical: 501-941-0940
Cabot West Medical: 501-941-1376
Cherry Valley Medical: 870-442-2040
Conway Medical: 501-932-9010
Des Arc Medical: 870-256-4178
Hazen Medical: 870-255-3696
Horseshoe Bend Medical: 870-670-4861
Jonesboro Midtown Medical: 870-333-5476
Jonesboro South Medical: 870-336-1675
Lake City Medical: 870-237-9928
Lonoke Medical: 501-676-0181
McCrory Medical: 870-731-5411
Melbourne Medical: 870-368-5030
Parkin Medical: 870-755-2234
Searcy Medical: 501-279-7979
Southside Medical: 870-569-4934
Vilonia Medical: 501-796-6740

Augusta Medical Clinic: 870-347-2508
Augusta Pharmacy: 870-347-5150
Bald Knob Clinic: 501-724-6207
Batesville-Harrison Medical: 870-307-0001
Brinkley Pharmacy: 870-734-1100
Cabot East Medical: 501-941-3522
Cabot Pharmacy: 501-941-3116
Carlisle Medical: 870-552-7303
Cotton Plant Medical: 870-459-3588
England Medical: 501-842-3131
Heber Springs Medical: 501-362-9426
Jacksonville Medical: 501-241-1676
Jonesboro North Medical: 870-802-3586
Kensett Medical:  501-742-5697
Little Rock Primary Care: 501-455-2712
Mayflower Medical: 501-470-9780
McCrory Medical 2: 870-347-1100
Newport Medical: 870-523-2944
Parkin Pharmacy: 870-755-2838
Searcy Medical 2: 501-203-0857
Swifton Medical: 870-485-2234
Wynne Clinic: 870-238-0377

### KENTUCKY

Bardwell Medical: 270-628-3333
Mayfield Medical: 270-804-7710
Paducah South Medical: 270-443-9474
Murry Medical: 270-753-2395

Barlow Medical: 270-334-3131
Paducah Medical: 270-575-3247
Paducah Pharmacy: 270-408-1584

### MISSISSIPPI

Pontotoc Medical: 662-490-1985



Welcome to *your Medical Home.*

Patient-centered is a way of saying that you, the patient, are the most important person in the health care system.

***You*** are the center of your health care.

> A Medical Home is an approach to providing total health care. With your Medical Home, you will have a personal clinician and a care team that includes other health care professionals, trusted friends, or family members (if you wish), and – most importantly—YOU!

## You and Your Medical Home team will work together:

- Your personal clinician and medical home team will get to know you and your family. They can help you manage your total health care. You can see the same team each time you visit, and they can help answer your health questions.

- The medical home team will listen to your questions and help you find your way through the sometimes confusing health care system.

- If you need to get help from other doctors, your team can support you every step of the way. For example, if you need to see a specialist, your team can keep in touch with the specialist to make sure you get the care you need.

- Your medical home will have convenient office hours to help you get an appointment at a time that works for you. You can also access your personal health portal to view your medical information and contact your health care team.

## Together, you and your team can work out a plan just for you, including:

- Personalized health care that meets your needs
- Tracking of your care so that you have all of your health care records in one place
- More ways to keep in touch with your health care team

## Get the most out of your Medical Home:

- Bring your list of questions, concerns, and medications
- Ask questions and share in the decision making process
- Follow you care plan and keep your health care team informed

*For more information about your Medical Home, contact your clinic or visit*
*www.arcare.net     www.kentuckycare.net     www.mississippicare.net*

 **Visit Checklist**

**A Medical Home is an approach to providing total health care. With your Medical Home, you will join a team that includes health care professionals, trusted friends, or family members (if you wish).**

| Get Ready For Your Appointment<br>(Use this handy **checklist**) | During Your Appointment<br>(Use this handy **checklist**) |
| --- | --- |
| o  Make a list of your health questions. Ask a friend or relative for help if you need it. Put the questions that are most important to you at the top of the list. | o  Write down the names of your team members: |
| o  Make a list of other health care providers you have visited. Write down their names, addresses, phone numbers, and the reasons you visited them. | o  Use your list of questions. Ask your most important questions firs. Even if you cannot get all of your answers on the first visit, having a list will help you keep track of the answers. |
| o  Take all of your medicines in their original containers to your appointment. Be sure to include all medications including prescriptions, over-the-counter, natural and herbal medications as well as vitamins. | o  Talk with your health care team about what health issue to work on first. |
| o  If you have insurance, take your insurance card or other insurance information with you to the appointment. | o  Be sure you know what you should do before you leave the office. |
| o  If you wish, ask a family member or trusted friend to go to your appointment with you. | o  Use your own words to repeat back the things you have discussed with your health care team. This way both you and your team will know the information is understood. |